**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAUL THOMAS, M.D, <br> 3515 SW 108th Ave <br> Beaverton, OR 97005 <br> KENNETH P. STOLLER, M.D., <br> 2410 Northview St. <br> Boseman, MT  59715, <br> and STAND FOR HEALTH FREEDOM, a Not-For-Profit Organization, <br> 3940 W. 96th St, Indianapolis, IN 46268 <br><br><br>                    Plaintiffs, <br><br>         v. <br><br> SUSAN P. MONAREZ, in her official capacity as Director of the CENTERS FOR DISEASE CONTROL AND PREVENTION, <br><br>                    Defendant. | Civil Action No. 1:25-cv-02685 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1.      This lawsuit challenges the Centers for Disease Control and Prevention's recommended childhood immunization schedule,[1] a 72+ dose regimen that represents the most aggressive vaccination program in the world. While some states make minor modifications to their required vaccination lists, most incorporate ACIP's recommended vaccines directly into statute or regulation and uniformly adopt ACIP's narrow contraindications and precautions list

---

[1] CDC, ACIP Vaccine Recommendations and Schedules, https://www.cdc.gov/acip/vaccine-recommendations/index.html.

1

for medical exemptions, thereby enforcing adherence to the recommended schedule as a practical matter.[2]

2.      ACIP's vaccine framework is only based on an evaluation of short-term individual vaccine risks. **The CDC has never studied the combined effects and the accumulating dangers of administering all of the vaccines on the CDC's recommended childhood vaccination schedule**.

3.      For over two decades, the Institute of Medicine has urged the CDC to study the cumulative effects of the pediatric vaccine schedule. First in 2002 (*see* Institute of Medicine, *Immunization Safety Review: Multiple Immunizations and Immune Dysfunction* (2002), https://www.ncbi.nlm.nih.gov/books/NBK220493/ (hereinafter "IOM 2002") and then again in 2013 (*see* Institute of Medicine, *The Childhood Immunization Schedule and Safety* (2013), https://doi.org/10.17226/13563 (hereinafter "IOM 2013"). These calls have remained unanswered to this day.

4.      ACIP organizes its vaccine recommendations into two categories: "Category A" recommendations apply universally to all children in an age group, while "Category B" involves shared clinical decision-making between physician and family based on individual circumstances. However, almost all childhood vaccines carry the Category A designation.[3]

---

[2] "While ACIP recommendations are just that, recommendations and not requirements, they have a far-reaching impact on vaccine policy with nearly 600 statutes and regulations across 49 states, three territories, and Washington, D.C., referencing ACIP. These laws often direct the use or consideration of ACIP recommendations in developing or implementing state or territorial vaccine policy. If the ACIP recommendations change, then any state or territorial policy that depends on them will be altered as well." Association of State and Territorial Health Officials (ASTHO), Impact of ACIP Recommendations on State Law (2025) https://www.astho.org/topic/resource/impact-of-acip-recommendations-on-state-law.

[3] Only COVID-19 vaccines and MenB vaccines for adolescents fall under Category B.

5.      The rigidity of the universal Category A recommendations is enforced through ACIP's narrow contraindications and precautions framework, which excludes many documented risk factors and prevents physicians from exercising individualized medical judgment. ACIP propagates an unscientific, one-size-fits-all model that denies individualized risk assessment while refusing to acknowledge that some children suffer serious harm from continued vaccination. Meanwhile, physicians who attempt to protect vulnerable patients face career destruction.

6.      Government reports confirm this crisis. The White House's Make America Healthy Again Commission Report (May 22, 2025) documents exploding rates of chronic illness in children and systematic retaliation against dissenting physicians.[4]

7.      When Plaintiff Dr. Paul Thomas published a study finding vaccinated children had significantly higher rates of chronic illness, which is exactly the research IOM recommended, his license was suspended within five days. When Plaintiff Dr. Kenneth Stoller used genetic markers to identify at-risk children, California's Medical Board declared only CDC guidelines could be followed, and revoked his medical license. The message is clear: conform or face professional banishment.

8.      The refusal to test the schedule is particularly striking given that vaccine advocates like Paul Offit claim children can theoretically tolerate 10,000 vaccine antigens, yet the CDC won't study whether the 72+ doses it actually recommends are safe in combination.[5]

---

[4] https://www.whitehouse.gov/wp-content/uploads/2025/05/MAHA-Report-The-White-House.pdf (hereinafter "MAHA Report").

[5] Paul A. Offit et al., "Addressing Parents' Concerns: Do Multiple Vaccines Overwhelm or Weaken the Infant's Immune System?" *Pediatrics* 109, no. 1 (January 2002): 124-129, https://pubmed.ncbi.nlm.nih.gov/11773551/.

9.      Unable to defend their position scientifically, the medical establishment now
seeks total control. On July 28, 2025, the American Academy of Pediatrics demanded
elimination of all religious and philosophical exemptions,[6] forcing 100% compliance despite
already achieving herd immunity thresholds.

10.     Finally, and consistent with the deliberate ignorance manifest in the CDC's
vaccine policies, there is no record of any biennial vaccine safety report made by HHS to
Congress concerning the safety of vaccines, which violates its statutory duty. (*See* Factual
Background, section F, page 17 below.) This silence reveals an agency that does not want to
know if its program causes more harm than good.

11.     Accordingly, Plaintiffs seek judicial intervention to restore scientific integrity and
medical freedom. Specifically: (1) a declaration that CDC's framework is arbitrary and
capricious and (2) only then may CDC return vaccines to Category A if the evidence supports it.
Seventeen EU nations, the UK, and Japan already use this voluntary model while maintaining
over 90% vaccination rates. (*See* Factual Background Section D, page 14 below.) Choice and
science can coexist.

## II. THE PARTIES

### A.      Plaintiffs

12.     Plaintiff Paul Thomas, M.D., is an individual residing in Oregon. He was a board-
certified pediatrician who founded and operated Integrative Pediatrics, serving over 10,000
patients until his medical license was suspended. Dr. Thomas developed individualized vaccine

---

[6] https://www.cidrap.umn.edu/childhood-vaccines/aap-calls-end-nonmedical-vaccine-exemptions-school-attendance.

protocols based on each patient's medical history and published peer-reviewed research comparing vaccinated and unvaccinated children—the exact study the Institute of Medicine had urged CDC to conduct. He lost his license for practicing and advocating this evidence-based approach.

13.     Plaintiff Kenneth P. Stoller, M.D., is an individual residing in Montana. He was a licensed physician specializing in integrative medicine with four decades of pediatric experience until his license was revoked. Dr. Stoller pioneered the use of genetic testing to identify children at risk for vaccine injury and issued medical exemptions based on these findings. The Medical Board revoked his license for deviating from CDC's one-size-fits-all guidelines.

14.     Stand for Health Freedom ("SHF") is a national 501(c)(4) not-for-profit organization headquartered in Indiana. It operates through 41 state chapter leaders and a nationwide network of close to one million supporters, and is dedicated to protecting informed consent, parental rights, and medical freedom for families.

**B.     Defendant**

15.     Defendant Susan P. Monarez is the Director of the Centers for Disease Control and Prevention. She is sued in her official capacity only. The Centers for Disease Control and Prevention is a federal agency within the United States Department of Health and Human Services, and is headquartered in Atlanta, Georgia. The CDC establishes national vaccination guidelines and contraindication criteria that states adopt as binding standards.

### III. JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) as this action arises under the Constitution and laws of the United States, including the

Administrative Procedure Act, 5 U.S.C. § 701 et seq., and the First and Fifth Amendments to the United States Constitution.

17.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act) and 5 U.S.C. § 702 (APA judicial review).

18.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because defendant is an officer of the United States sued in her official capacity. The CDC is an agency within the Department of Health and Human Services, which maintains its headquarters in Washington, D.C.

## IV. STANDING

19.     Although ACIP recommendations are nominally "advisory," this characterization is a legal fiction. The widespread statutory incorporation of ACIP guidance into state law transforms these federal recommendations into binding national mandates. Once ACIP adopts a vaccine recommendation or narrows its contraindications list, that standard is effectively enforced in almost every jurisdiction in the United States. This makes ACIP the de facto rulemaking body for childhood vaccination policy nationwide—despite the absence of notice-and-comment rulemaking or cumulative safety testing.[7]

---

[7] "References to ACIP recommendations appear in several different areas of vaccine policy including state and territorial laws related to: School immunizations. Mandatory insurance coverage. Provider scope of practice to dispense or administer vaccines. Required vaccine information. Mandatory and voluntary immunizations for health care workers and patients. Standing orders and protocols for dispensing or administering vaccines. Notifications for recommended or overdue immunizations. Vaccine purchasing determinations." Association of State and Territorial Health Officials (ASTHO), Impact of ACIP Recommendations on State Law (June 23, 2025), https://www.astho.org/topic/resource/impact-of-acip-recommendations-on-state-law.

20.     Article III standing requires: (1) injury in fact that is concrete and particularized; (2) causal connection between the injury and challenged conduct; and (3) likelihood that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

21.     Dr. Thomas suffered concrete injury when his medical license was suspended and his 14-year practice destroyed. This occurred after he published peer-reviewed research comparing health outcomes between vaccinated and unvaccinated children, the very type of study the Institute of Medicine had urged CDC to conduct.

22.     Dr. Thomas's retrospective analysis of over 3,000 patients found vaccinated children had significantly higher rates of asthma (OR 4.49), allergic rhinitis (OR 30.1), and ADHD (OR 3.33).[8]

23.     Five days after publication, Oregon's Medical Board emergency-suspended Dr. Thomas's medical license, citing "serious concerns regarding the safety and welfare of his patients." The Board's action targeted his individualized vaccine protocols—protocols that deviated from CDC guidelines and that produced the data showing higher chronic illness rates in vaccinated children. The timing strongly suggests retaliation for publishing unwelcome findings.

24.     Eight months later, the journal retracted the study without prior notice or opportunity for the authors to respond—departing from standard editorial practice. The retraction cited concerns about study design, not data integrity.

25.     This injury is directly traceable to CDC's contraindications framework. Dr. Thomas's individualized approach, which allowed parents to make informed choices based on

---

[8] Lyons-Weiler & Thomas, *Relative Incidence of Office Visits*, Int'l J. Envtl. Res. Pub. Health (2020). https://doi.org/10.3390/ijerph17228674.

risk factors, violated the one-size-fits-all standard that medical boards enforce. When his research documented better health outcomes from this individualized approach, it provided evidence that contradicted CDC's universal recommendations, leading to his license suspension.

26.     Judicial relief would redress Dr. Thomas's injury. If childhood vaccines were reclassified to Category B, the individualized protocols that formed the basis for his discipline would become permissible medical practice, which could lead to his obtaining a new medical license.

27.     Between 2016-2019, Dr. Stoller issued medical exemptions based on genetic predispositions and documented family histories of adverse reactions. He relied on emerging peer-reviewed research showing certain children face heightened risks.

28.     California's Medical Board revoked his license, explicitly ruling that "the standard of care for medical exemptions, as set forth in the ACIP guidelines adopted by CDPH, requires that exemptions be based on recognized contraindications or precautions." [9] Genetic predispositions and family history are not ACIP-recognized contraindications. The revocation of Dr. Stoller's medical license constitutes concrete injury.

29.     Dr. Stoller's injury flows directly from CDC's narrow framework. Despite scientific evidence that some children are genetically vulnerable, the CDC's guidelines prohibit individualized risk assessment. The Board's decision confirms that only CDC criteria—not clinical judgment or emerging science—determine acceptable medical practice.

---

[9] *In re Stoller*, Cal. Med. Bd. Decision at 32 (Apr. 12, 2021)
https://search.dca.ca.gov/details/8002/A/41183/82248c0e93cb87387b066f703eae8d73.

30.     Reclassifying vaccines to Category B shared decision-making would eliminate the rigid standard used to revoke Dr. Stoller's license, which could lead to the reinstatement of his medical license.

31.     As indicated above, Plaintiff Stand for Health Freedom ("SHF") is a national 501(c)(4) grassroots advocacy organization headquartered in Indiana, operating through 41 state chapter leaders and a nationwide network of supporters.

32.     SHF has suffered concrete organizational injury as a direct result of the CDC's refusal to conduct safety studies on the cumulative childhood vaccine schedule. This refusal has allowed CDC to maintain universal Category A recommendations that states adopt as school-entry mandates. In response, SHF has been forced to divert substantial resources from its normal mission to address the consequences of these policies, including: developing educational materials to counter vaccine safety misinformation, hosting webinars presenting scientific evidence excluded from CDC's process, coordinating legislative advocacy for informed consent laws, and supporting families facing school exclusion. These diversions constitute cognizable organizational injury.

33.     SHF's injuries are fairly traceable to CDC's conduct. The CDC's untested schedule drives state mandates and creates the coercive environment SHF must combat. But for CDC's refusal to test the schedule and its issuance of blanket recommendations without safety data, SHF would not need to divert resources to advocacy and crisis response. A favorable decision requiring CDC to conduct safety testing and reclassify vaccines to Category B would eliminate the need for SHF's extraordinary resource diversions, allowing it to return to its core mission.

## V. FACTUAL BACKGROUND

### A.    The CDC's Contraindications Framework: Rigid Categories Without Scientific Basis

34.     The CDC's childhood vaccination policy operates through ACIP, established in 1964. Though statutorily advisory, ACIP's recommendations become binding through state adoption. The framework's rigidity appears in CDC's contraindications tables, which limit valid contraindications to: (1) severe allergic reaction (anaphylaxis) after a previous dose; (2) severe combined immunodeficiency (for live vaccines); and (3) a handful of other rare conditions.

35.     Individual vaccines undergo limited FDA clinical trials before approval, typically monitoring adverse events for days or weeks.[10] **Neither the FDA nor the CDC has ever required or conducted safety testing of the cumulative childhood schedule,** now at least 72 doses.

36.     This framework excludes documented injuries that do not fit narrow diagnostic categories. A child who suffers seizures, developmental regression, or autoimmune disease after vaccination typically will not qualify for exemption unless the reaction was immediate anaphylaxis or the exact same reaction occurs with subsequent doses.[11]

---

[10] 21 C.F.R. § 600.80 (post-marketing adverse event reporting requirements acknowledge pre-licensure studies are limited).

[11] *See* Physicians for Informed Consent, *Vaccines and the Diseases they Target* at 55 (PIC Press 2025), https://physiciansforinformedconsent.org/silver-booklet/ (noting that the CDC's framework excludes a history of autoimmune disease, prior adverse reactions in family members, non-anaphylactic adverse events, and other known clinical warning signs such as mitochondrial dysfunction and immunologic anomalies, despite physicians consistently identifying these as risk-enhancing factors for vaccine injury).

37.     The framework has not meaningfully changed in two decades, despite thousands of VAERS reports of adverse events annually.[12] Meanwhile, states have adopted these guidelines as binding standards. According to the National Conference of State Legislatures, medical exemptions in "all states" must meet CDC/ACIP criteria.[13] This makes ACIP's narrow contraindications the de facto national mandate.

38.     This framework extends beyond school requirements. Medical boards use ACIP guidelines as the exclusive standard of care when evaluating physician conduct. Doctors who write exemptions based on clinical judgment rather than CDC criteria face professional discipline, as both Dr. Thomas and Dr. Stoller discovered.

39.     The CDC's contraindication framework is enforced through direct administrative action, including disciplinary proceedings against physicians writing non-ACIP exemptions. In addition, thousands of physician-issued exemptions were overturned based solely on nonconformity with CDC guidelines, regardless of clinical judgment. The result: physicians cannot exercise clinical judgment, and children with family histories of vaccine injury or genetic vulnerabilities must continue the full schedule or lose access to education.[14]

---

[12] VAERS Database, https://vaers.hhs.gov/data.html (documenting tens of thousands of reports annually).

[13] National Conference of State Legislatures, "States with Religious and Philosophical Exemptions from School Immunization Requirements" (2023), https://www.ncsl.org/health/state-non-medical-exemptions-from-school-immunization-requirements.

[14] Physicians for Informed Consent, *Vaccines and the Diseases They Target* at 54 (PIC Press 2025), https://picphysicians.org/pic-book/.

**B.      The IOM's Repeated Warnings: 25 Years of Willful Blindness**

40.      The Institute of Medicine (now the National Academy of Medicine) is the federal government's most authoritative advisor on health policy. For over two decades, IOM has consistently warned that the safety of the full childhood vaccine schedule remains untested.

41.      In 2002, IOM's *Immunization Safety Review: Multiple Immunizations and Immune Dysfunction* stated: "The committee was unable to identify any studies that directly evaluated the safety of the entire immunization schedule." IOM 2002 at 152. The report recommended "studies of the health outcomes of fully vaccinated children compared with those following alternative schedules, including no vaccination." *Id.* at 153.

42.      IOM reiterated these concerns in multiple reports. Its 2005 *Vaccine Safety Research, Data Access, and Public Trust* criticized CDC's surveillance systems as inadequate to detect rare or delayed adverse events, particularly noting the Vaccine Safety Datalink's limitations. [15]

43.      Most comprehensively, IOM's 2013 report, *The Childhood Immunization Schedule and Safety*, found: "No studies have compared the differences in health outcomes... between entirely unimmunized populations of children and fully immunized children... Furthermore, studies designed to examine the long-term effects of the cumulative number of vaccines or other aspects of the immunization schedule have not been conducted." IOM 2013 at 9-10.

44.      The 2013 report specifically recommended CDC prioritize research to: (1) compare health outcomes of vaccinated versus unvaccinated children; (2) examine

---

[15] IOM, *Vaccine Safety Research* (2005) at 55-57, https://www.nap.edu/catalog/11234/.

cumulative effects of vaccines; and (3) identify potentially susceptible subpopulations. *Id.* at 11-13.

45.     CDC has implemented none of these recommendations. No comparative studies. No cumulative safety analysis. No systematic identification of vulnerable subgroups. When Dr. Thomas conducted exactly such a study privately, he lost his license.

46.     This is deliberate ignorance. CDC continues expanding the schedule, while refusing to study whether 72+ doses in combination cause more harm than benefit. The agency that claims to "follow the science" has ignored its most important outside scientific advisor for 25 years.

### C.     Declining Child Health: The Unexplained Epidemic

47.     While CDC expands its untested vaccine schedule, American children have become the sickest in the developed world. The MAHA Report documents this crisis: over 50% of U.S. children now suffer from at least one chronic condition. MAHA Report at 8.

48.     The numbers are staggering. According to the CDC, autism prevalence exploded from 1 in 150 children (2000) to 1 in 31 (2023).[16] Asthma affects 1 in 12 children, up from 1 in 32 in 1980.[17] Type 1 diabetes incidence increases 3-4% annually.[18] Food allergies increased 50% between 1997-2011.[19] Nearly 20% of children are obese.[20]

---

[16] CDC, Autism Data & Statistics, https://www.cdc.gov/autism/data-research/index.html.

[17] CDC, Asthma Facts, https://www.cdc.gov/asthma/nhis/default.htm.

[18] *Lancet Diabetes & Endocrinology* (2019), https://doi.org/10.1016/S2213-8587(19)30412-7.

[19] CDC, NCHS Data Brief No. 121 (2013), https://www.cdc.gov/nchs/data/databriefs/db121.pdf.

[20] CDC, Childhood Obesity Facts, https://www.cdc.gov/obesity/data/childhood.html.

49.    This is not normal. No other developed nation approaches these rates. Japanese children receive 12-13 vaccines and have autism rates of 1 in 100. European children receive 20-30% fewer vaccines than Americans yet have better health outcomes across every metric.[21]

50.    The temporal correlation is undeniable. The vaccine schedule expanded from 24 doses (1983) to 72+ doses (2025). Chronic illness rates rose in parallel. **Yet, CDC has never investigated whether its aggressive vaccination program contributes to this epidemic**.

51.    The Department of Defense now reports 71% of American youth are unfit for military service due to obesity, asthma, ADHD, and other chronic conditions.[22] An entire generation has been damaged while health authorities look the other way.

52.    When researchers attempt to investigate, they are destroyed. Dr. Thomas found vaccinated children had approximately 4.5x more asthma, 30x more allergic rhinitis, and 3.3x more ADHD. Rather than replicate his findings, the medical establishment revoked his license and retracted his study.

53.    This willful blindness has consequences. While CDC clings to theoretical models about vaccine safety, real children suffer real injuries. The agency tasked with protecting public health refuses to ask whether its signature program has become a cause of the problem.

**D.    International Success with Voluntary Programs: Proof of a Better Way**

54.    While American children grow sicker under CDC's coercive mandate, peer nations achieve better outcomes through voluntary consent. Seventeen EU countries, the UK,

---

[21] OECD Health Statistics 2023, https://www.oecd.org/health/health-data.htm.

[22] DoD, Qualified Military Available (2023) at 12, https://www.esd.whs.mil/Portals/54/Documents/FOID/Reading%20Room/Personnel_Related/23-F-1060_QMA_Technical_Report_Mar_2022.pdf.

and Japan have no mandatory vaccination—yet maintain 90%+ coverage rates and healthier children.[23]

55.     The evidence is unequivocal. Sweden's Public Health Agency states: "All vaccinations within national vaccination programs are voluntary and offered free of charge."[24] Coverage: 97%. Denmark's childhood vaccines are "free of charge and voluntary." Coverage: 95%.[25] Japan abolished mandatory vaccination in 1994. Coverage: 98%.[26]

56.     These nations prove CDC's core premise wrong. High vaccination rates don't require coercion. Parents make responsible choices when given honest information and medical freedom. Their children are healthier for it.

57.     The UK's approach is instructive. NHS guidance states vaccines "are not mandatory and cannot be given without your consent."[27] British parents discuss risks and benefits with their physicians. Coverage remains at 92.4%.[28] No medical boards hunting doctors. No families expelled from school. Just informed consent—the foundation of medical ethics.

---

[23] Farina et al., "Childhood Mandatory Vaccinations," *Vaccines* (2024), https://doi.org/10.3390/vaccines12111296.

[24] Swedish Public Health Agency, https://www.folkhalsomyndigheten.se/the-public-health-agency-of-sweden/.

[25] Danish Health Authority, Vaccination Programme, https://www.sst.dk/en/vaccination.

[26] WHO/UNICEF Coverage Data Japan (2023), https://cdn.who.int/media/docs/default-source/country-profiles/immunization/2023-country-profiles/immunization_jpn_2023.pdf.

[27] NHS, "Booking your child's vaccination appointment, https://www.nhs.uk/vaccinations/booking-your-childs-vaccination-appointment/.

[28] NHS Digital, Childhood Vaccination Coverage Statistics 2023-24, https://digital.nhs.uk/data-and-information/publications/statistical/nhs-immunisation-statistics/england-2023-24.

58.     Most damning: these countries do not shield vaccine manufacturers from liability. Market forces and legal accountability ensure safety. Only America combines the world's most aggressive schedule with blanket immunity for drug companies, a toxic combination that removes all incentive for caution.[29]

59.     The international data demolishes the CDC's argument that eliminating parental choice is necessary for public health. Countries respecting medical freedom have lower infant mortality, less chronic disease, and comparable vaccination rates. The only thing American exceptionalism has produced is exceptionally sick children.

**E.     Suppression of Scientific Dissent: Silence Through Destruction**

60.     Unable to defend their policies scientifically, CDC and its allies enforce orthodoxy through professional annihilation. The message is clear: challenge the vaccine program and face professional destruction.

61.     Dr. William Thompson, senior CDC scientist, confessed in 2014 that he and colleagues destroyed data showing MMR vaccine increased autism risk in African American boys. His 10,000 pages of documents remain sealed while CDC pretends the scandal never happened.[30]

62.     Dr. Andrew Zimmerman, the government's own expert witness, submitted an affidavit that vaccines can trigger autism in susceptible children. DOJ lawyers buried his opinion

---

[29] 42 U.S.C. § 300aa-1 et seq.

[30] Thompson Statement, Aug. 27, 2014, https://cdn.factcheck.org/UploadedFiles/William-Thompson-statement-27-August-2014.pdf.

and misrepresented his views in court. The children he could have helped were denied compensation.[31]

63.     Researchers face systematic targeting. When Christopher Exley found aluminum from vaccines in autistic brains, his university terminated his funding after 40 years.[32] When James Lyons-Weiler published Thomas's vaccinated/unvaccinated study, the journal retracted it without allowing response—pure censorship disguised as peer review.

64.     Medical boards have become enforcement arms. California alone has revoked licenses of dozens of doctors for writing exemptions based on family history, genetic testing, or prior reactions—medical judgment CDC guidelines don't recognize. The Board told Dr. Stoller explicitly: only ACIP criteria matter, not your clinical assessment.

65.     This is the behavior of institutions protecting orthodoxy rather than pursuing truth. Real science invites challenge, replicates findings, debates openly. CDC's vaccine program does the opposite: it destroys challengers, blocks research, and enforces compliance through fear.

**F.     Twenty-Seven Years of Silence: The Ultimate Proof of Willful Ignorance**

66.     While the failure to test the vaccine schedule is CDC's most damning scientific breach, HHS's abandonment of its statutory congressional reporting requirements perfectly embodies the federal government's approach to vaccine safety (at least until very recently): don't look, don't tell, don't know. The National Childhood Vaccine Injury Act of 1986 requires HHS to

---

[31] Zimmerman Affidavit, Sept. 7, 2018, *Yates v. HHS,* https://icandecide.org/wp-content/uploads/2020/01/zimmerman-affidavit.pdf.

[32] Exley, "My Career and Aluminum," *Hippocratic Post* (2021), https://www.hippocraticpost.com/pharmacy-drugs/infant-vaccines/.

report to Congress every two years on efforts to reduce vaccine adverse reactions. 42 U.S.C. § 300aa-27.

67.     In 1990, HHS convened the statutory task force, disbanded it in 1998, but has not reconvened in 27 years, with no extant copy of any HHS report to Congress in the public domain. During this silence, the schedule ballooned from 24 to 72+ doses, autism went from 1 in 150 to 1 in 31, and chronic disease consumed over half of American children—yet Congress received nothing.

68.     The *Flores* lawsuit exposed this 27-year abandonment of statutory duty.[33] No reports. No updates. No acknowledgment that the requirement even existed. Just decades of silence about vaccine safety efforts.

69.     Agencies confident in their programs showcase their data. Agencies that go dark for decades know exactly what they would find. Twenty-seven years of silence tells this Court everything it needs to know.[34]

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act - Arbitrary and Capricious Agency Action**
**(5 U.S.C. § 706(2)(A))**

70.     Plaintiffs incorporate by reference all preceding paragraphs.

---

[33] *Flores v. Kennedy,* (2:25-cv-00916, D. Nev., filed May 27, 2025) https://childrenshealthdefense.org/wp-content/uploads/Flores-II-v.-Kennedy-Jr.-Press_Redacted.pdf.

[34] On August 14, 2025, it was announced that HHS is reinstating the task force which will be headed by the NIH Director and that it will issue its first report within two years. https://www.hhs.gov/press-room/hhs-reinstates-task-force-on-safer-childhood-vaccines.html. This is an encouraging small first step under the bold new leadership. However, it does not detract from the need for the relief requested in this lawsuit, given the lack of safety testing of the entire vaccine schedule.

## A.    Failure to Consider Important Aspect of the Problem

71.    Under the APA, agency action is arbitrary and capricious when the agency has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). This is exactly what CDC has done.

72.    The "important aspect" CDC ignores is the cumulative safety of administering 72+ vaccine doses to children. While the agency recommends this aggressive schedule as universal Category A policy, it has never studied whether the combination causes more harm than benefit. Individual vaccine trials lasting days cannot answer questions about cumulative effects over years. This represents a fundamental gap in the agency's scientific analysis.

73.    This failure is not from lack of notice. The Institute of Medicine explicitly told CDC to study the full schedule's safety in 2002. IOM repeated this recommendation in 2013, finding "no studies have compared the differences in health outcomes between entirely unimmunized populations and fully immunized children." IOM 2013 at 9. CDC offers no explanation for ignoring its most prestigious scientific advisor for over two decades.

74.    The real-world consequences prove the arbitrariness. When Dr. Thomas conducted the exact study IOM recommended, namely, comparing vaccinated and unvaccinated children, he lost his license. CDC thus punishes research into the very question it refuses to investigate.

## B.    Procedural Violation – Binding Rules Without Rulemaking

75.    Separately, CDC violated the APA by creating binding rules without notice-and-comment rulemaking. Though ACIP recommendations are statutorily advisory, every state enforces them as mandatory standards. Medical boards revoke licenses for deviation. Schools exclude children. Insurance coverage depends on compliance.

76.    When agency "guidance" has binding effect, it must undergo rulemaking. *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). CDC evaded this requirement, depriving the public of participation rights while creating a de facto national mandate.

77.    Plaintiffs seek a declaration that CDC's recommendation of the childhood vaccine schedule violates the APA on both grounds. The Court should vacate the Category A recommendations and require reclassification of all childhood vaccines as Category B shared clinical decision-making until CDC completes scientifically rigorous studies proving the cumulative schedule is safe.

## SECOND CLAIM FOR RELIEF
### Violation of Substantive Due Process – Fifth Amendment

78.    Plaintiffs incorporate by reference all preceding paragraphs.

79.    The Fifth Amendment prohibits the federal government from depriving any person of life, liberty, or property without due process of law.

80.    Parents possess a fundamental liberty interest in directing their children's medical care. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("the interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court").

81.    Children possess a fundamental right to bodily integrity. *See Rochin v. California*, 342 U.S. 165, 172 (1952) ("conduct that shocks the conscience…offends even hardened sensibilities"); *Union Pacific Ry. Co. v. Botsford,* 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person.").

82.     A right is "fundamental" if it is "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997).

83.     This case does not challenge state vaccine mandates or seek personal belief exemptions. Unlike *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), *Zucht v. King,* 260 U.S. 174 (1922), or recent cases upholding school mandates, Plaintiffs challenge the federal government's creation of universal medical standards without scientific basis, which states then enforce as if they were evidence-based. This Court need not revisit *Jacobson*; it need only require that federal medical recommendations be based on actual evidence.

84.     The CDC knows that states adopt ACIP recommendations wholesale. Every state medical board uses them as the exclusive standard. Every school mandate incorporates them. By setting these standards without testing the cumulative schedule, CDC effectively eliminates informed consent and physician discretion nationwide—not directly through federal mandate, but through deliberate creation of standards it knows states will enforce.

85.     The CDC's own scientific advisors, the Institute of Medicine, have repeatedly warned that "key elements of the immunization schedule, such as the number, frequency, timing, order, and age at administration of vaccines, have not been systematically examined in research studies." Institute of Medicine, *The Childhood Immunization Schedule and Safety: Stakeholder Concerns, Scientific Evidence, and Future Studies* at 2 (2013). The IOM expressly recommended "observational studies using data from the Vaccine Safety Datalink to compare health outcomes in children who receive vaccines according to the recommended schedule with those who receive fewer vaccines." *Id.* at 10.

86.     Despite these warnings, CDC has refused for over 25 years to conduct or require any safety study of the cumulative childhood vaccine schedule, even as it continues to expand the schedule and issue "universal" Category A recommendations it knows states will mandate.

87.     As a result, more than 72 vaccine doses are required for every American child, even though "no studies have compared the health outcomes of entirely unvaccinated populations with those of fully vaccinated children" as part of a cumulative schedule. *Id.* at 3.

88.     This deliberate creation of untested standards, knowing they will be coercively enforced by the states, is not merely arbitrary and capricious; it is so reckless and indifferent to health and safety as to "shock the conscience." *Rochin v. California*, 342 U.S. at 172. The CDC effectively forces millions of children to undergo 72+ medical interventions without ever studying whether the cumulative program causes more harm than benefit.

89.     The historic tradition recognized by *Jacobson v. Massachusetts* and its progeny is one of reasonable, rational, and evidence-based public health policy, not blind or deliberate ignorance of risk. Mandates issued without even minimal scientific justification are outside this tradition.

90.     Plaintiffs seek only what due process requires: that federal medical recommendations be based on actual evidence of the safety of the series of medical interventions recommended by the CDC. Until that time, Plaintiffs request that childhood vaccines be reclassified to Category B shared decision-making.

### THIRD CLAIM FOR RELIEF
### Violation of Equal Protection – Fifth Amendment

91.     Plaintiffs incorporate by reference all preceding paragraphs.

92.     The Fifth Amendment's Due Process Clause includes an equal protection component that prohibits irrational discrimination. *Bolling v. Sharpe*, 347 U.S. 497 (1954).

93.    CDC's framework irrationally denies the existence of medically vulnerable children. According to CDC, a child who suffered seizures, regression, or autoimmune disease after vaccination is medically identical to a child with no adverse reactions. The agency refuses to recognize any category of "vaccine-vulnerable" children despite mounting evidence they exist.

94.    This denial of medical reality is irrational. Children who react badly to one vaccine often react to others containing similar adjuvants (such as aluminum in 7+ vaccines), preservatives, or antigens. Yet CDC's framework treats each vaccine as if administered in a biological vacuum, ignoring cross-reactivity and cumulative burden on vulnerable immune systems.

95.    The irrationality deepens: CDC admits it has never studied which children face higher risks. It refuses to investigate whether genetic markers, family history, or prior reactions predict future injury. Having chosen ignorance about differential risks, it then declares all children medically identical, a conclusion that can only be maintained by refusing to examine contradictory evidence.

96.    Even under rational basis review, government cannot deny reality to achieve its goals. CDC's pretense that vaccine-vulnerable children don't exist—maintained by refusing to study them—fails any conception of rationality. It is equivalent to denying peanut allergies exist because acknowledging them would complicate school lunch programs.

97.    The harm is concrete: vaccine-injured children are forced to continue receiving vaccines that may cause further damage, or forfeit their education. This Sophie's choice flows directly from CDC's irrational insistence that medically fragile children are a myth.

98.    Plaintiffs seek recognition that CDC's denial of medical vulnerability violates equal protection's minimal rationality requirement.

**FOURTH CLAIM FOR RELIEF**
**Violation of the First Amendment – Suppression of Medical and Scientific Dissent**

99.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

100.    The First Amendment prohibits the government from silencing disfavored viewpoints or orchestrating the suppression of scientific debate through regulatory capture and professional retaliation. Yet that is precisely what has occurred here.

101.    The CDC's contraindications framework has become a tool of censorship, operating through state medical boards to silence physicians who dare to question the agency's untested assumptions about vaccine safety. This is viewpoint discrimination masquerading as public health policy.

102.    Plaintiffs Thomas and Stoller exemplify this unconstitutional regime. Dr. Thomas published peer-reviewed research questioning vaccine safety based on data from his own patients—the very type of study the Institute of Medicine had urged for decades. His reward? Professional destruction within days of publication. Dr. Stoller used emerging genetic science to identify children at risk. He tried to apply personalized medicine to protect vulnerable patients. His reward? License revocation for deviating from CDC orthodoxy.

103.    This suppression extends beyond individual physicians. When researchers publish findings that challenge the CDC's narrative, their studies are retracted without findings of fraud. When physicians testify about vaccine injuries they've witnessed, medical boards threaten their licenses. When scientists within the CDC itself, like William Thompson, attempt to expose data manipulation, they are silenced by agency leadership.

104.    The pattern is unmistakable: the government has created a system where only one viewpoint on vaccine safety may be expressed without professional consequences. Physicians

must either parrot the CDC's position that the untested schedule is universally safe, or face career annihilation. This forced orthodoxy violates the core of the First Amendment, which exists precisely to prevent the government from decreeing official truths in matters of scientific debate.

105.    Parents too are victims of this censorship regime. The First Amendment protects not only the right to speak but the right to receive information. *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 756–57 (1976). When the government systematically silences physicians who might offer different risk assessments or individualized medical advice, it deprives parents of the informed consent that is the cornerstone of medical ethics and constitutional liberty.

106.    The government cannot accomplish through coordinated suppression what the First Amendment forbids it to do directly. *NRA v. Vullo*, 602 U.S. 175 (2024). By establishing contraindication criteria that operate as professional speech codes, enforced through state medical boards with career-ending consequences, the CDC has created an unconstitutional system of viewpoint discrimination.

107.    This is not about regulating medical fraud or malpractice. This is about enforcing ideological conformity. The bitter irony: the medical establishment ruthlessly enforces professional adherence to a 'scientific consensus' about vaccine safety that rests on no science at all, having never studied the cumulative effects of the recommended schedule. This is the antithesis of both scientific integrity and First Amendment freedom.

108.    Accordingly, Plaintiffs seek declaratory and injunctive relief against this unconstitutional suppression of medical and scientific speech, and the restoration of physicians' ability to exercise professional judgment without fear of retaliation.

## CONCLUSION

109.    The facts establish a continuing public health outrage hiding in plain sight: America administers more vaccines than any nation on earth while producing the sickest children in the developed world. Yet CDC demands proof of harm while refusing to conduct the studies that could provide it. This Court should reallocate the burden of proof in public health: they who recommend dozens of medical interventions for millions of children must first prove that these interventions taken together result in more good than harm. Other free nations trust parents with this choice, and achieve better outcomes. American children deserve the same trust and protection, and they deserve better from their government.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that CDC's contraindications and precautions framework violates the Administrative Procedure Act by failing to consider the important aspect of cumulative vaccine safety and by imposing binding rules without required rulemaking;

2. Declare that CDC's framework is arbitrary and capricious

3. Declare that CDC's enforcement of an untested 72+-dose vaccine schedule violates the Fifth Amendment's Due Process Clause by compelling medical interventions without scientific basis while punishing those who seek evidence of safety;

4. Declare that CDC's denial of medically vulnerable children violates the Fifth Amendment's Equal Protection guarantee by irrationally treating all children identically despite refusing to study differential risk;

5. Declare that CDC's contraindication framework violates the First Amendment by suppressing medical and scientific dissent through coordinated professional retaliation.

6.  Enjoin CDC from maintaining any Category A recommendations for childhood vaccines and order immediate reclassification of all childhood vaccines to Category B shared clinical decision-making, until such time as CDC demonstrates through scientifically rigorous studies that the cumulative schedule is safe.

7.  Order CDC to conduct scientifically rigorous studies of the cumulative safety of the full childhood vaccination schedule as recommended by the Institute of Medicine, including comparison of health outcomes between fully vaccinated and unvaccinated populations;

8.  Maintain jurisdiction until CDC demonstrates through proper studies that any vaccine proposed for Category A recommendation is safe when administered as part of the cumulative schedule;

9.  Award Plaintiffs their costs and reasonable attorneys' fees; and

10.  Grant such other relief as the Court deems just and proper.


Dated: August 15, 2025


                                        Respectfully submitted,

                                        /s/ Richard Jaffe

                                        RICHARD JAFFE, ESQ.
                                        428 J Street, 4th Floor
                                        Sacramento, California 95814
                                        Tel: 916-492-6038
                                        Fax: 713-626-9420
                                        rickjaffeesquire@gmail.com
                                        CA Bar No. 289362
                                        DC District Court ID No.  CA00224

                                        Attorney for Plaintiffs Paul Thomas,
                                        M,D., Kenneth P. Stoller, M.D. and
                                        Stand for Health Freedom