**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PAUL THOMAS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ERICA SCHWARTZ,[1]<br><br>Defendant. | Case No. 25-cv-2685 (JMC) |

# MEMORANDUM OPINION

The United States Centers for Disease Control and Prevention (CDC) publishes a nonbinding set of guidelines known as the "recommended schedule" of vaccines for children and adolescents. States then look to the recommended schedule in crafting their vaccine requirements.

Plaintiffs Paul Thomas and Kenneth Stoller sued the CDC Director, alleging that they lost their medical licenses because they followed "individualized" vaccine protocols, rather than CDC guidelines. Thomas and Stoller are joined by Plaintiff Stand for Health Freedom, who alleges that it has been forced to divert organizational resources to combat the effects of the CDC vaccine guidelines. Plaintiffs seek declaratory and injunctive relief.

The Court concludes that Plaintiffs lack standing to bring their claims. Thomas and Stoller have not shown causation or redressability, and Stand for Health Freedom has not alleged a legally cognizable injury. The Court will **GRANT** Defendant's motion to dismiss.[2]

---

[1] Plaintiffs originally sued Susan P. Monarez in her official capacity as Director of the Centers for Disease Control and Prevention. The Court automatically substitutes Defendant Erica Schwartz pursuant to Federal Rule of Civil Procedure 25(d).

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

## I. BACKGROUND

The CDC is statutorily required to "assist" states in preventing the spread of disease, "cooperate with and aid" states in enforcing health regulations, and "advise" states on the improvement of public health. 42 U.S.C. § 243(a). As part of that mandate, the CDC publishes and regularly updates a "recommended childhood immunization schedule." ECF 8 at 9; *see* ECF 1 ¶ 1; *see also Recommended Child and Adolescent Immunization Schedule*, CDC (July 2, 2025), https://www.cdc.gov/vaccines/hcp/imz-schedules/downloads/child/0-18yrs-child-combined-schedule.pdf [https://perma.cc/B3UH-WN5Q]. That schedule provides a detailed timeline of recommended vaccine doses for children ages zero to eighteen. *See Recommended Child and Adolescent Immunization Schedule*, *supra*. Plaintiffs allege that this recommended regimen is "the most aggressive vaccination program in the world." ECF 1 ¶ 1.

The CDC's recommended schedule is guided by the proposals of the Advisory Committee on Immunization Practices (ACIP), an organization of medical and public-health experts who meet three times per year to discuss vaccine recommendations. *See Who Sets the Immunization Schedule?*, CDC (Aug. 9, 2024), https://www.cdc.gov/vaccines-children/schedules/who-sets.html [https://perma.cc/CS9G-NL89]; ECF 1 ¶ 1 & n.2 (alleging that ACIP "recommend[s]" vaccine schedules that "have a far-reaching impact on vaccine policy"). In addition to drafting the vaccine schedule itself, ACIP provides a recommended "list" of "contraindications"—i.e., conditions in a patient that increase the risk of a serious adverse reaction—and "precautions" that should be considered before administering a vaccine. *See* ECF 1 ¶ 1; *see also Contraindications and Precautions*, CDC (July 25, 2024), https://www.cdc.gov/vaccines/hcp/imz-best-practices/contraindications-precautions.html [https://perma.cc/WMF4-6US6]. Plaintiffs allege that this list

is a "narrow" one, in that it "excludes many documented risk factors [of vaccines] and prevents physicians from exercising individualized medical judgment." ECF 1 ¶ 5.

Once ACIP creates its recommended schedule, the CDC may adopt its recommendations, although it is not legally required to. ECF 1 ¶ 1 n.2 (quoting source which states that "ACIP recommendations are just that, recommendations and not requirements"); *accord* ECF 8 at 10; *Who Sets the Immunization Schedule?*, *supra* ("CDC sets the immunization schedules based on ACIP's recommendations."). And once the CDC sets its official recommended schedule (with or without adherence to ACIP's proposals), that schedule may be adopted by individual states, although that too is not legally required. *See* ECF 1 ¶ 1 (alleging that "some states," though not most, "make minor modifications to [the CDC] required vaccination lists"); *accord* ECF 8 at 10–11.

Although neither the ACIP schedule nor the CDC schedule has the force of law, Plaintiffs allege that as a matter of practice, the CDC almost always accepts ACIP's schedule, and the states almost always follow the CDC's adoption of that schedule. ECF 1 ¶ 1. Thus, the thrust of Plaintiffs' allegations is that the recommended vaccine schedule that ACIP and the CDC publish is de facto, if not de jure, the law of the land. *See id.* ¶ 19 ("Although ACIP recommendations are nominally 'advisory,' this characterization is a legal fiction. The widespread statutory incorporation of ACIP guidance into state law transforms these federal recommendations into binding national mandates."). And Plaintiffs are concerned about that alleged reality, because they claim that the "aggressive" and "rigid" CDC schedule has not been thoroughly tested, despite the (alleged) fact that rates of chronic conditions like autism and asthma are rising in tandem with vaccinations. *Id.* ¶¶ 34–53.

Plaintiffs would prefer that the CDC publish a recommended schedule that provides more bandwidth for "individualized medical judgment." *See* ECF 1 ¶ 5; *see also id.* at 26 (Prayer for Relief). And they allege that when the individual plaintiffs in this case—Drs. Paul Thomas and Kenneth Stoller—tried to use their "individualized medical judgment" to recommend that certain children not be vaccinated, they lost their medical licenses. *Id.* ¶¶ 12–13. First, Thomas—who practiced in Oregon—developed his own individualized vaccine protocols for patients. *Id.* ¶ 12. He also conducted research which found that vaccinated children had higher rates of chronic conditions than unvaccinated children. *Id.* ¶¶ 21–22. He alleges that shortly after this research was published, the Oregon Medical Board "emergency-suspended" his license, finding that there were "serious concerns regarding the safety and welfare of his patients." *Id.* ¶ 23.[3] Thomas alleges that Oregon effectuated this suspension because it aimed to "retaliat[e]" against him for publishing the "unwelcome findings" that vaccinations are linked to chronic health conditions. ECF 1 ¶ 23.

Stoller's story is similar. He practiced medicine under a California license. *See* ECF 1 ¶ 28. During his practice, he "issued medical exemptions" for childhood vaccinations based not on ACIP/CDC guidelines, but on "genetic predispositions" and "documented family histories of adverse reactions." *Id.* ¶¶ 13, 27. He alleges that the California Medical Board revoked his license because of this practice. *Id.* ¶¶ 27–28.[4]

---

[3] *See also* Paul Norman Thomas, Order of Emergency Suspension (Or. Med. Bd. Dec. 4, 2020), https://omb.oregon.gov/Clients/ORMB/OrderDocuments/e579dd35-7e1b-471f-a69a-3a800317ed4c.pdf [https://perma.cc/MUA3-8RUQ] (hereinafter "Thomas Emergency Order"); Paul Norman Thomas, Stipulated Order (Or. Med. Bd. Oct. 6, 2022), https://omb.oregon.gov/clients/ormb/OrderDocuments/3f4010d3-92d5-43bb-bd1b-2c16b24260f0.pdf [https://perma.cc/2KFY-D3MU].

[4] *See also* Kenneth P. Stoller, No. 800-2017-034218 (Med. Bd. Cal. 2021), https://www2.mbc.ca.gov/BreezePDL/document.aspx?path=%5CDIDOCS%5C20210209%5CDMRAAAHL23%5C&did=AAAHL21021618 3459888.DID [https://perma.cc/4VDM-GKEZ] (hereinafter "Stoller Decision"); *Stoller v. Med. Bd. of Cal.*, 2021 Cal. Super. LEXIS 108488 (Sacramento Cnty. Super. Ct. Sep. 13, 2021) (hereinafter "Stoller Superior Court Order").

Thomas and Stoller allege that if the CDC's recommended schedule and contraindications list had allowed for "individualized risk assessment[s]" of vaccines, then they would not have lost their licenses. ECF 1 ¶¶ 25, 28–29. They further allege that if the CDC was ordered by this Court to "reclassif[y]" its vaccine schedule so that "individualized protocols" became "permissible medical practice," then they could obtain new medical licenses. *Id.* ¶¶ 26, 30.

Thomas and Stoller are joined in this suit by Plaintiff Stand for Health Freedom (SHF). SHF is a nonprofit that is "dedicated to protecting informed consent, parental rights, and medical freedom for families." ECF 1 ¶ 14. It asserts that it "has been forced to divert substantial resources from its normal mission to address the consequences of [CDC vaccine] policies." *Id.* ¶ 32. SHF, like Thomas and Stoller, seeks a court order "requiring CDC to conduct safety testing" on its recommended vaccine regimen, and further requiring that the CDC "reclassify" vaccines on its schedule to recommend that all childhood vaccines be administered only on a case-by-case basis. *Id.* ¶ 33.

Plaintiffs filed a complaint seeking declaratory and injunctive relief from the Director of the CDC, now Erica Schwartz, in her official capacity. ECF 1. Plaintiffs seek, among other relief, a declaration that the CDC's vaccine frameworks are arbitrary and capricious; a declaration that the CDC's use of its recommended vaccine schedule violates the First and Fifth Amendments; an order directing the CDC to conduct "scientifically rigorous studies of the cumulative safety of the full childhood vaccination schedule"; and an order enjoining the CDC from recommending any vaccines unless the recommendations are based on "shared clinical decision-making," at least until the CDC can demonstrate that the schedule it currently proposes is safe. *Id.* at 26 (Prayer for Relief). Schwartz moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF 8.

## II. LEGAL STANDARD

The Court resolves Defendant's motion pursuant to Federal Rule of Civil Procedure 12(b)(1). Under that rule, a defendant may move to dismiss a complaint for lack of subject matter jurisdiction. The plaintiff bears the burden of establishing that subject matter jurisdiction exists. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Under Article III of the Constitution, the subject matter jurisdiction of the federal judiciary is limited only to "cases" and "controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). Under this case-or-controversy requirement, a plaintiff must have standing to sue. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To establish standing, a plaintiff must plausibly allege "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). In a case with multiple plaintiffs, "only one plaintiff need have standing for [the] lawsuit to proceed." *Hall v. D.C. Bd. of Elections*, 141 F.4th 200, 209 (D.C. Cir. 2025).

"In analyzing whether a plaintiff has standing at the dismissal stage," a court "must accept the factual allegations in the complaint as true." *Holistic Candlers & Consumers Ass'n v. Food & Drug Admin.*, 664 F.3d 940, 943 (D.C. Cir. 2012). A plaintiff's "general factual allegations of injury resulting from the defendant's conduct may suffice" to show standing, "for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015). However, a court "do[es] not assume the truth of legal conclusions nor [does it] accept inferences that are unsupported by the facts set out in the complaint." *Id.* And district courts "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack

of jurisdiction." *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *accord Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 44 (D.D.C.), *amended*, No. 18-cv-2473, 2019 WL 11307644 (July 22, 2019) ("Because standing is a jurisdictional issue, the court may consider evidence outside the complaint when deciding a motion to dismiss based on standing.").

If, after accepting the facts in a complaint as true, a plaintiff still fails to show that all three components of standing are satisfied, then the case must be dismissed. *See Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

## III. ANALYSIS

Plaintiffs must plead all three elements of standing—injury, causation, and redressability—for the Court to have subject matter jurisdiction. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiffs have not sufficiently done so here. Neither Thomas nor Stoller pleads a viable theory of causation or redressability, and SHF does not plead a legally cognizable organizational injury. The Court therefore grants the motion to dismiss on standing grounds, and need not consider any of the Parties' 12(b)(6) arguments.

### A. Thomas and Stoller Have Not Demonstrated Causation or Redressability.

To have standing, a plaintiff must demonstrate causation by showing that their injury is "fairly traceable" to the defendant's challenged conduct. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Additionally, a plaintiff must demonstrate that their injury likely can be redressed by a favorable decision. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). As closely intertwined concepts, causation and redressability are often described as two sides of the same coin. *See, e.g.*, *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

In cases where a plaintiff's injury accrues based on the "unfettered choices made by independent actors not before the courts," the plaintiff has the burden to demonstrate that these injuries were still caused by some action taken by the defendant, and that a favorable ruling against the defendant would redress their injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). To satisfy this burden in a case (like this one) where plaintiffs seek only forward-looking relief, the plaintiff must show that the relevant third parties "will likely react in predictable ways" to the defendant's actions. *See Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019).

Thus, in determining whether a harm was caused by a defendant (and can be remedied by an order against that defendant), it is necessary to determine the degree of influence that the defendant exerts on any third parties that exist in the chain of causation. *See, e.g.*, *Simon*, 426 U.S. at 41–42. The Supreme Court's decision in *Murthy v. Missouri*, 603 U.S. 43 (2024), illustrates this principle. In that case, a group of social media users sued several federal officials and agencies, alleging that the officials and agencies were pressuring social media platforms to censor certain posts in violation of the First Amendment. *Id.* at 48. The Supreme Court found that those plaintiffs failed to establish causation: Even though the government defendants had *some* influence on social media content moderation, the harm the plaintiffs alleged also stemmed from "independent[]" third-party actions. *Id.* at 59–60. In particular, the Court noted that "the platforms did not speak only with the [government] defendants about content moderation; they also regularly consulted with outside experts," and employed their own "content-moderation policies" separate from any government influence. *Id.* at 60. Thus, because the third parties who actually inflicted the alleged harm were motivated by multiple factors independent of the defendants' conduct, the plaintiffs had failed to show standing. *Id.* at 76.

This case is like *Murthy*, at least with respect to Thomas and Stoller. The injury Thomas and Stoller allege is the loss of their medical licenses. ECF 1 ¶¶ 21, 28. But the Defendant they sued (the Director of the CDC) did not take any action with respect to their licenses. The entities that *did* take such actions (the Oregon and California state medical boards) are not defendants in this case. Thomas and Stoller argue that this distinction is irrelevant, because the boards' decisions were directly predicated on the ACIP/CDC schedule. *See* ECF 9 at 10 ("[Thomas and Stoller] allege, and document, that state boards explicitly adopted ACIP recommendations as the governing standard of care and then disciplined physicians for deviation from that federally-defined standard."). But a review of the boards' decisions themselves—which is appropriate on a 12(b)(1) motion[5]—shows that these third parties chose to strip Thomas's and Stoller's licenses on several independent grounds.

First, when considering the appropriate standard of care for administering childhood vaccinations, both the Oregon and California boards relied on sources beyond just the ACIP/CDC guidelines. The Oregon board, for instance, cited not just the ACIP/CDC guidelines, but also an Oregon statute which establishes the standard of care to be "that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community." Thomas Emergency Order at 2 (quoting Or. Rev. Stat. § 677.265(1)(c)). And the California board relied on expert testimony in establishing the relevant standard of care. *See* Stoller Decision at 21. While the expert in the Stoller Decision testified that a physician who adhered to the ACIP Guidelines would indeed meet the standard of care, the expert also testified that "a physician may depart from the ACIP Guidelines" in situations where the

[5] *See Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005); *Nwoye v. Sidley Austin LLP*, No. 25-cv-1360, 2026 WL 2948894, at *7 (D.D.C. Sept. 30, 2026) ("When considering a motion to dismiss, courts may take judicial notice of public records from other proceedings.").

guidelines "do not address a patient's circumstances fully or precisely." *Id.* Thus, when the Oregon and California boards concluded that Thomas and Stoller had violated the relevant standards of care, they reached that conclusion not just because Thomas and Stoller had contravened ACIP/CDC guidelines, but also because they had failed to meet independent medical standards of diligence and reasonableness. *Cf. Murthy*, 603 U.S. at 59–60; *see also* Stoller Superior Court Order at *16–17 (holding that California law "contemplate[s] [vaccine] exemptions predicated on medically supported, professional judgment *not strictly limited to* contraindications or precautions in the ACIP Guidelines" (emphasis added)).

And second, both the Oregon and California boards based their decisions not just on conduct related to the administering of vaccines, but also on other independent instances of different conduct. For instance, the Oregon medical board said that its conclusion to suspend Thomas's license was "support[ed]," Thomas Emergency Order at 2, by the following factors:

- Thomas purportedly "breached the standard of [medical] care" by failing to refer a patient "to the emergency room or hospital" when the patient presented with serious medical conditions, *id.* at 4;
- Thomas purportedly "failed to provide an appropriate referral to a pediatric gastroenterologist" when a patient presented with certain conditions, *id.* at 5;
- Thomas purportedly tried to force a child to follow a particular treatment plan when that plan was "against [the parent's] express wishes," *id.* at 3; and
- Thomas purportedly "fail[ed] to document" circumstances in which parents had refused vaccinations, *id.* at 3.

Likewise, the Stoller Superior Court Order indicated that the Stoller Decision found that Stoller obtained "scant and insufficiently documented" family histories before recommending medical treatment, and also "recorded a history of potentially very serious events" but "did not obtain the pertinent medical records or otherwise investigate." Stoller Superior Court Order at *7. That Order also stated that the "evidence" weighed in the Stoller Decision indicated that Stoller "misdiagnosed and exaggerated patients' conditions." *Id.* at *24.

To be sure, both the Thomas Emergency Order and Stoller Decision discussed Thomas's and Stoller's childhood vaccination practices at length. *See generally* Thomas Emergency Order; Stoller Decision. And the Court also notes that it does not necessarily take as true any of the underlying purported facts cited above, since those purported facts do not appear in Plaintiffs' complaint. *See Jerome Stevens Pharms.*, 402 F.3d at 1253; *cf. Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 788–89 (D.C. Cir. 2019) ("District courts may, at the Rule 12(b)(6) stage, take judicial notice of publicly filed pleadings in related actions as evidence of what was alleged in the other actions, although they may not treat as true the matter alleged."); *Fusco v. United States*, No. 20-cv-864, 2021 WL 1061208, at *1 (D.D.C. Mar. 19, 2021) ("On [a] motion to dismiss, the Court views the facts pled in the complaint as true, except where citing public records."). But whether the underlying facts are true or not, what matters is that the Oregon and California medical boards chose to strip Thomas's and Stoller's licenses on multiple grounds that are independent from anything the CDC is alleged to have done in this case. Thus, the redress that Thomas and Stoller want—the reinstatement of their medical licenses, ECF 1 ¶¶ 26, 30—is not likely to result from an order that runs against the CDC. Even if Thomas and Stoller received everything requested in their complaint, they have not shown or adequately pled that it is likely that their medical licenses will be reinstated, for the Oregon and California medical boards based their decisions on factors unrelated to anything attributable to the CDC. *Cf. Murthy*, 603 U.S. at 59–60.

The chief case on which Plaintiffs rely, *Diamond Alternative Energy, LLC v. EPA*, is not contrary. ECF 9 at 11, 13–14. In that case, fuel producers sued to challenge regulations that would require the manufacture of more electric vehicles and fewer gasoline-powered vehicles. 606 U.S. 100, 104 (2025). They alleged an economic injury from loss of fuel sales. *Id.* at 113–14.

The case turned on redressability. *Diamond Alternative Energy*, 606 U.S. at 105. The plaintiffs argued that a favorable order invalidating the regulations would redress their economic injury, because the removal of the regulations would likely cause third-party automobile manufacturers to "make more cars powered by gasoline and other liquid fuels, thereby increasing purchases of those fuels." *Id.* at 104–05. The Supreme Court agreed. *Id.* at 114. It concluded that the automobile manufacturers would predictably increase their supply of gas-powered cars if the regulations were invalidated because multiple independent sources of record evidence supported a "commonsense" principle: Because "a regulation [is] designed to produce a particular [economic] effect on the market," the "vacating [of] that regulation would be [likely] to reduce that [economic] effect on the market." *Id.* at 117–20.

There is no "commonsense" analog to this case. The third party in *Diamond Alternative Energy* was, effectively, an entire "market"—a collection of automobile manufacturers who, by virtue of their aggregate nature, respond to natural economic forces in foreseeable ways that courts can comfortably predict. *See* 606 U.S. at 117–18. The third parties here, though, are two identifiable decision-makers that adhere not to the laws of economics, but to their own professional medical judgment. *See* ECF 1 ¶¶ 26, 30. If the Court ordered the CDC to change its vaccine guidelines, the Oregon and California medical boards would not, as a matter of common sense, simply and probabilistically reverse their previous decisions about Thomas and Stoller (or at least, Plaintiffs have not pled facts sufficient to allege as much). Instead, there is a legitimate possibility that the license-stripping decisions would remain in place, especially since the Thomas Emergency Order and Stoller Decision were based not solely on ACIP/CDC regulations, but on multiple sources defining a standard of care and multiple instances of purported non-vaccination-related misconduct. *See generally* Thomas Emergency Order; Stoller Decision; Stoller Superior Court

Order. And even if the medical board decisions *were* solely based on ACIP/CDC recommendations, those decisions were based on those recommendations as they existed at the time of the adjudications. A Court-ordered change in the CDC's vaccine schedule would cause the CDC to make recommendations that are quite different from those that existed at that time. *Compare* ECF 1 at 26, *with Recommended Child and Adolescent Immunization Schedule*, CDC (Feb. 11, 2021), https://www.cdc.gov/vaccines/hcp/imz-schedules/downloads/past/2021-child.pdf [https://perma.cc/4BUV-LQRU]. Neither the governments of California nor Oregon, nor their state medical licensing boards, would be required to adhere to those new recommendations. *See, e.g.*, Cal. Health & Safety Code § 120164(a) (tying California's recommended immunizations to the frozen-in-time ACIP recommendations of January 2025, rather than any future recommendations). Relief, then, would remain speculative. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–11 (2013) (rejecting standing theory predicated on speculation).

Thomas and Stoller have therefore failed to demonstrate causation or redressability. They lack standing to sue.

### B. Stand for Health Freedom Lacks a Cognizable Injury for Third-Party Organizational Standing.

Thomas and Stoller's lack of standing would be irrelevant at this stage if Plaintiff SHF itself had standing. *See Hall v. D.C. Bd. of Elections*, 141 F.4th 200, 209 (D.C. Cir. 2025). But SHF does not, because it lacks a cognizable injury-in-fact.

SHF proceeds under a theory of organizational standing. *See* ECF 9 at 15. An organization has standing to "sue on [its] own behalf for injuries [it] has sustained," provided that it "satisf[ies] the usual standards for injury in fact, causation, and redressability." *All. for Hippocratic Med.*, 602 U.S. at 393–94 (2024). For an organization to show that it has a concrete and actionable injury, it must show some direct harm to its "activities," rather than a harm to its "abstract social interests."

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In other words, for an organization to have standing to sue a defendant, the organization must allege that the defendant "directly affected and interfered with [the organization's] core business activities," and not simply that the organization has chosen to "divert[] its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 394–95.

That language from *Alliance* puts SHF in an immediate bind. That's because SHF claims that it has been "injur[ed]" by the CDC, because in "response" to the CDC's actions, "SHF has been forced to divert substantial resources from its normal mission." ECF 1 ¶ 32. That alleged injury looks an awful lot like the sort of injury the Supreme Court rejected in 2024.

SHF argues that notwithstanding this language, its alleged injury is governed not by *Alliance*, but by *Havens Realty*. ECF 9 at 15–16. That's a tough spot to be in, for the Supreme Court in *Alliance* cautioned that "*Havens* was an unusual case," one which should not be extended "beyond its context." *All. for Hippocratic Med.*, 602 U.S. at 396. In *Havens*, the Supreme Court found that an organization that operated a housing counseling service had a cognizable injury when the defendant gave the organization's employees false information about apartment availability. 455 U.S. at 368, 379. This conduct directly impeded the organization's functioning. *See id.* at 379; *see also All. for Hippocratic Med.*, 602 U.S. at 395 (analogizing *Havens* conduct to a defendant who "sell[s] defective goods" to a plaintiff). In effect, the defendant's conduct made the organization's work more difficult in a discrete, tangible way: The plaintiff organization's activities (counseling renters) were harder to undertake because the subject matter of that counseling (which apartments were rentable) had been corrupted by the defendant. *See All. for Hippocratic Med.*, 602 U.S. at 395; *Havens*, 455 U.S. at 379. That is the "prototypical" case of organizational standing, i.e., one in which "the plaintiff organization engaged in direct services to individuals that

were made more difficult by the challenged action." *Robert F. Kennedy Hum. Rts. v. Dep't of State*, No. 25-cv-1774, 2026 WL 820811, at *5 (D.D.C. Mar. 25, 2026), *reconsideration denied*, 2026 WL 2592877 (D.D.C. Sept. 2, 2026); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an *inhibition* of the organization's *daily operations*." (emphasis added)).

SHF's allegations do not fit the bill. There is no allegation in the complaint that the actual activities SHF engages in have become more difficult to carry out by virtue of something the CDC has done. Instead, all SHF alleges is that it is now spending more time and money to do the very activities it already does. For instance, Plaintiffs' opposition to the motion to dismiss states that "SHF's core mission is supporting families navigating school vaccine mandates, developing resources for parents seeking medical exemptions, and coordinating state-level advocacy for informed consent laws." ECF 9 at 16; *see also* ECF 1 ¶ 14 (alleging that SHF "is dedicated to protecting informed consent, parental rights, and medical freedom for families"). But the injury SHF alleges is that it has diverted resources "from its normal mission to address the consequences of [the CDC's actions], including: developing educational materials to counter vaccine safety misinformation, hosting webinars presenting scientific evidence excluded from CDC's process, coordinating legislative advocacy for informed consent laws, and supporting families facing school exclusion." ECF 1 ¶ 32. All of those alleged adverse actions—"developing educational materials," "hosting webinars," "coordinating legislative advocacy," and "supporting families"—are indistinguishable from what SHF claims its "core mission" is: "supporting families," developing resources," and "coordinating state-level advocacy." *Compare* ECF 1 ¶ 32, *with* ECF 9 at 16. To have pled an injury under *Havens*, SHF would have needed to allege that the CDC did

something that made the very *act* of education or advocacy more difficult for SHF to carry out. *See Food & Water Watch*, 808 F.3d at 919. SHF has alleged instead that it continues to do the same education and advocacy it would otherwise do, but now from a more reactive, rather than proactive, posture. *See* ECF 1 ¶ 32. That does not suffice. *See All. for Hippocratic Med.*, 602 U.S. at 393–96; *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025) (finding no organizational standing where organization argued that "it must work harder to gather information and expend additional resources" on advocacy).[6]

Because SHF has failed to allege a cognizable injury, it too lacks standing.

* * *

Because no Plaintiff has sufficiently pled that they have standing to pursue this case, Defendant's motion to dismiss for lack of subject matter jurisdiction, ECF 8, is **GRANTED**, and Plaintiffs' complaint is **DISMISSED.** A separate order accompanies this memorandum opinion.

**SO ORDERED.**

JIA M. COBB
United States District Judge

Date: October 30, 2026

[6] The Court also notes that even when an organization can plead an injury on the basis of its operational expenditures, the organization must plead that it has incurred or will incur "operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920. SHF makes no such allegation here. *See generally* ECF 1.